U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

AUG 1 5 2017

TONY R. MOORE, CLERK
BY: _____
DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

WILSON GOODLEY                          CIVIL ACTION NO. 2:16-01087

VERSUS                                  JUDGE JAMES T. TRIMBLE, JR.

WAL-MART LOUISIANA LLC                  MAG. JUDGE KAY

**MEMORANDUM RULING**

Before the court is a "Motion for Summary Judgment" (R. #53) filed by defendant, Wal-Mart Stores, Inc. ("Wal-Mart") wherein the mover seeks to dismiss with prejudice Plaintiff's lawsuit alleging race and age discrimination in violation of 42 U.S.C. § 2000e, et seq. (Title VII) and the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 623, et seq. (ADEA).

**STATEMENT OF FACTS**

Plaintiff, Wilson Goodley, an African-American born on January 29, 1953, was employed at Wal-Mart Store No. 469 in Lake Charles, Louisiana from June 1986 until his discharge on February 10, 2015.[1] The Store Manager, Keith Duplechin, terminated Mr. Goodley due to long standing problems with attendance and job performance.[2]

In its statement of material facts, Wal-Mart lists the following complaints Mr. Goodley made for past discrimination:

---

[1] Defendant's exhibit 1, Goodley depo. pp. 27, 37-38, 40-42.
[2] Defendant's exhibit 2, Keith Duplechin Declaration, ¶ 13.

1

1. In 1997, after being disciplined for excessive absenteeism, Mr. Goodley filed a complaint with the Louisiana Commission on Human Rights; the charge was dismissed.[3]

2. In 1997, after Mr. Goodly spoke out about alleged mistreatment of Associates, Mr. Goodley complained he was the subject of racially based retaliation.[4]

3. On August 20, 1997. Mr. Goodley complained of "abusive, oppressive, cruel, harassment, and provocative method of administering" manager's authority over Wal-Mart associates."[5]

4. On September 10, 1997, Mr. Goodley authored a complaint letter alleging he was harassed and discriminated against by members of the management teams and such harassment was racially motivated and intended for his "eventual termination."[6]

5. On March 21, 2002, Mr. Goodley authored a letter to the Wal-Mart Regional Vice President complaining that the management team made unreasonable demands and created a hostile work environment and that certain actions were based on racial animus.[7]

6. In April 2002, Mr. Goodley was terminated for absenteeism. He was later reinstated after producing a doctor's statement reporting that he had been under a doctor's care. Mr. Goodley claims the termination constituted race discrimination.[8]

---

[3] Defendant's exhibit 1, pp. 85-88 & 92.
[4] Id. pp. 113; Defendant's exhibit 3, Written Complaint.
[5] Defendant's exhibit 4.
[6] Defendant's exhibit 6.
[7] Defendant's exhibit 1, Goodley depo. pp. 117-119; exhibit 7.
[8] Id. pp. 122-124; exhibit 8; exhibit 9.

7. On March 11, 2004, Mr. Goodley filed a complaint against the Support Manager alleging he was threatened with disciplinary action for refusing to push shopping carts due to other pending job responsibilities.[9] Mr. Goodley believed the manager's actions were based on racial animus.[10]

8. In May 2012, Mr. Goodley authored a complaint to the Manager about the Department Manager's assignment of tasks which Mr. Goodley believed were out of racial animus.[11]

The majority of Associates and Managers throughout Mr. Goodley's employment are and have been African-American.[12] Wal-Mart further provides a history of Mr. Goodley's attendance problems through his Annual Performance Evaluations:

1. In his November 7, 1989 performance evaluation, Mr. Goodley commented "I do need to be at work on time, because it could create a problem and I will do so."[13]

2. In his May 1991 performance appraisal, Mr. Goodley's "plan of action" was to improve his tardiness by trying to avoid being late and missing too many days.[14]

3. In his May 1992 performance review, Mr. Goodley stated that he needed improvement on arriving at work on time as scheduled.[15]

---

[9] Id. Goodley depo. pp. 98-99, 128-129.
[10] Id.
[11] Defendant's exhibit 11; Defendant's exhibit 1, pp. 137-138.
[12] Defendant's exhibit 12 and 13.
[13] Defendant's exhibit 1, Goodley depo. p. 150; exhibit 15.
[14] Id. Goodley dep. p. 151.
[15] Id. Goodley dep. p. 148; exhibit 17.

4. In Mr. Goodley's 1994 Associate Self-Evaluation, he stated that he intended to "try to be more consistent on getting to work on time."[16]

5. Mr. Goodley's 1997 performance review states that he sometimes had a problem reporting to work on time.[17]

6. In Mr. Goodley's 1998 Associated Evaluation, "attendance" and "punctuality" were areas of needed improvement.[18]

7. In his 2008 performance review, Mr. Goodley stated that he "will work on punctuality and attendance."[19]

8. In Mr. Goodley's 2010 performance evaluation, attendance was identified as an area of opportunity.[20]

9. In Mr. Goodley's 2012 performance evaluation, attendance was identified as an area of opportunity.[21]

Wal-mart has submitted a history of Mr. Goodley's coaching for improvement as follows:

1. On December 12, 2003, Mr. Goodley received a First Written Coaching as a result of having 23 unapproved absences in a six month period.[22]

2. On March 29, 2005, Mr. Goodley received a First Written Coaching for six (6) unexcused absences in one month.[23]

---

[16] Id. Goodley depo. p. 152; exhibit 18.
[17] Id. Goodley depo. pp. 148-149.
[18] Id. Goodley depo. p. 153; exhibit 19.
[19] Id. Goodley depo. pp. 155-156; exhibit 20.
[20] Id. Goodley depo. pp. 155-156; exhibit 21.
[21] Id. Goodley depo. pp. 154-155; exhibit 22.
[22] Id. Goodley depo. pp. 156-157; exhibit 23.
[23] Defendant's exhibit 24.

3. On April 29, 2006, Mr. Goodley received a First Written Coaching after he "missed numerous scheduled days of work in a six month rolling period."[24]

4. On June 17, 2008, Mr. Goodley received a First Written Coaching for 20 unapproved absences and eight tardies during the pertinent time period.[25]

5. On August 25, 2009, Mr. Goodley received a First Written Coaching for 19 absences within a 6 month rolling period at which time Mr. Goodley was aware that seven (7) in the six month rolling period should have resulted in termination.[26]

6. On September 9, 2011, Mr. Goodley was observed to have 14 points assessed for attendance related issues; Wal-mart's policy allowed three (3) points in six (6) months.[27]

Wal-Mart submits summary judgment evidence of Mr. Goodley's job performance problems as follows:

1. Wal-Mart used a computerized time management system to monitor productivity of overnight stockers.[28]

2. Mr. Goodley acknowledged that he consistently had problems meeting benchmark performance levels set by the computerized time management system.[29]

---

[24] Defendant's exhibit 25.
[25] Defendant's exhibit 26.
[26] Defendant's exhibit 27.
[27] Defendant's exhibits 14 and 28.
[28] Defendant's exhibit 1, Goodley depo. p. 44-47.
[29] Id.

3. While working as a full-time night stocker, Mr. Goodley also operated a clothing store and worked 30 to 35 hours a week during the day. He was often so tired he frequently slept during breaks while working as a night stocker.[30]

4. Manager Duplechin spoke to Mr. Goodley on more than one occasion about his job performance issues which Mr. Duplechin opined were accentuated by Mr. Goodley's full time work during the day and full-time night shift.[31]

5. Mr. Duplechin offered Mr. Goodley a maintenance position that did not utilize the computer based time management system, but Mr. Goodley refused the offer.[32]

6. On January 3, 2015, the overnight Co-Manager authored an email sent to Mr. Duplechin regarding attendance and performance issues, one of which involved Mr. Goodley and the fact that he was on his third coaching for "attendance/job performance issues." The email reported that Mr. Goodley's performance was "still below expectations" and that he continued to have attendance issues.[33]

Wal-Mart submits summary judgment evidence as to Mr. Goodley's coachings/progressive discipline which led to his termination as follows:

1. On July 20, 2013, Mr. Goodley was issued a First Written Coaching due to "Attendance/Punctuality problems." He was advised that the next level of action would be a "Second Written up to and including Termination" if Goodley's attendance/punctuality problems continued.[34]

---

[30] Id. pp. 51-52.
[31] Defendant's exhibit 2, Duplechin Declaration, ¶ 8.
[32] Id. ¶ 10; Defendant's exhibit 1, Goodley depo. pp. 49-50.
[33] Defendant's exhibit 29.
[34] Defendant's exhibits 30 and 64.

2. On February 5, 2014, Mr. Goodley received a Second Written Coaching for "Attendance/Punctuality" wherein it was noted that Mr. Goodley had five (5) tardies and four (4) absences in the preceding six (6) months.[35]

3. On March 30, 2014, Mr. Goodley received a Third Written Coaching due to "Job Performance" because African-American Assistant Manager Simmons observed that Mr. Goodley had been unable to complete tasks on several occasions and that an increase in productivity was needed.[36]

4. Between August 11, 2014 and February 10, 2015, Mr. Goodley had ten (10) unapproved absences and five (5) unapproved tardies.[37]

5. In February 2015, Mr. Duplechin made the decision to terminate Mr. Goodley based on (a) chronic attendance problems that were unabated, (b) unimproved job performance, and (c) Mr. Goodley had been issued a Third Written Coaching.[38]

6. In his Exit Interview, Mr. Goodley was eligible for rehire by Wal-Mart, and even though he was aware that he was eligible for rehire, he has never reapplied for employment with Wal-Mart.[39]

Wal-Mart also provides ratios of black to white stockers during the pertinent time periods as follows:

---

[35] Defendant's exhibit 31.
[36] Defendant's exhibit 32.
[37] Defendant's exhibit 33.1.
[38] Defendant's exhibit 2, ¶ 13.
[39] Defendant's exhibit 34; Defendant's exhibit 1, Goodley dep. pp. 23-24.

1. On February 15, 2015 (at the time of Mr. Goodley's termination), 74% of the stockers were either African-American or minority, and 25.7% were Caucasian.[40]

2. On February 10, 2016, 88% of the stockers were African-American and minority, whereas 12% were Caucasian.[41]

3. From February 10, 2016, 80% of the stockers were African-American and minority, whereas 20% were Caucasian.[42]

4. Mr. Goodley was not replaced by a specific new hire, and he is not aware if he was replaced by a white associate.[43]

5. On February 18, 2015, three (3) night stockers were hired; two (2) were African-American and one (1) was Caucasian. From February 11, 2015 to December 31, 2015, in accordance with Wal-Mart's practice of hiring on a regular and continuing basis, of the eleven newly hired stockers, nine were African-American.[44]

In his lawsuit, Mr. Goodley attempts to establish racial discrimination based on white associates who allegedly received more favorable treatment than Mr. Goodley. Wal-Mart has submitted evidence of certain Wal-Mart employees that Mr. Goodley relies upon to establish discrimination.

*A.M.*

---

[40] Defendant's exhibit 33.4.
[41] Defendant's exhibit 33.5.
[42] Defendant's exhibit 33.6.
[43] Defendant's exhibit 1, Goodley depo. p. 56; Defendant's exhibit 2, Duplechin Declaration, ¶ 16.
[44] Defendant's exhibit 33.7.

A.M. is a 53 year-old white co-worker who Mr. Goodley alleges had absenteeism which exceeded Mr. Goodley's absences. Mr. Goodley alleges that A.M. was not disciplined or terminated.[45] A.M. was employed as a sales associate from January 3, 2010 through January 12, 2014. (A.M. was born in 1965). A.M. was terminated on January 12, 2014 and her discharge is identified as "Assignment Completed."[46] A.M. was rehired as a grocery stocker on March 23, 2014.[47] On August 31, 2014, A.M. was given a "Second Written Coaching for "Attendance/Punctuality. [48] On January 3, 2015, Mr. Duplechin received an email from Ms. Loerwald indicating that A.M. had "19 absences with no coachings – includes 11 no shows. Not including time or requested for LOA – need to coach ASAP."[49]

Wal-Mart submits undisputed summary judgment evidence that from July 14, 2014 through January 13, 2015, many of A.M. absences should not have been counted as "occurrences" because A.M. was on an intermittent leave of absence and from October 10, 2014 through November 29, 2014, A.M. was on personal leave.[50]Consequently, when A.M. received her first coaching in January 2015, shortly after Loerwald's email, A.M. had between seven (7) and thirteen absences in over thirteen months.[51]

On January 7, 2015, A.M. received a First Written Coaching for "Attendance/Punctuality" and on April 3, 2015 A.M. received a Second Written Coaching for "Attendance/Punctuality".[52]

---

[45] Defendant's exhibit 37.
[46] Defendant's exhibit 38.
[47] Id.
[48] Defendant's exhibit 39.
[49] Defendant's exhibit 29.
[50] Defendant's exhibit 68.
[51] Id.
[52] Defendant's exhibits 40 and 41.

On June 10, 2015 A.M. received a Third Written Coaching for "Attendance/Punctuality" and was advised that the next level of action would be termination.[53] On August 23, 2015, A.M. was terminated due to excessive absences and tardiness.[54]

*R.W.B.*

R.W.B. is a Caucasian stocker who was born in 1957, just four (4) years younger than Mr. Goodley.[55] R.W.B. worked for Wal-Mart for 12 years and was terminated on February 6, 2012 due to job performance issues.[56] R.W.B. was eligible for rehire and was rehired on July 17, 2012 as a stocker. From August 2004 until April 2015, R.W.B. worked as a Maintenance Associate in a different department than Mr. Goodley with a different supervisor.[57] Consequently, because R.W.B. was not a night stocker in January 2015, Ms. Loerwald would not have reviewed his attendance records to prepare her January 3, 2015 email.

On September 12, 2013, R.W.B. received a First Written coaching for Respect for the Individual.[58] On October 6, 2013, R.W.B. received a Second Written coaching for meal break violations.[59] On May 1, 2014, R.W.B. received a Third written coaching for Poor Customer Service.[60] Neither Duplechin nor Loerwald were aware that R.W.B. had any attendance issues.[61]

*W.M.*

---

[53] Defendant's exhibit 42.
[54] Defendant's exhibit 38.
[55] Defendant's exhibit 37.
[56] Defendant's exhibit 43.
[57] Id.
[58] Defendant's exhibit 44.
[59] Defendant's exhibit 45.
[60] Defendant's exhibit 46.
[61] Defendant's exhibit 35, Loerwald Declaration, ¶ 11; Defendant's exhibit 2, Duplechin Declaration, ¶ 17.

W.M. (born in 1987) is a white night stocker who Mr. Goodley alleges had excessive absences but was not terminated.[62] W.M. was terminated on June 15, 2009 after three (3) days of unreported absences.[63]W.M. was rehired on March 28, 2010 as a stocker.[64] From December 15, 2013 until November 29, 2015, W.M. worked as a sales associate in the dairy/frozen foods department.[65] On November 29, 2015, W.M. became a night stocker; he received a First Written Coaching for "Attendance/Punctuality" on July 12, 2010[66] and a Second Written Coaching on August 28, 2010.[67] W.M. received a Third Written Coaching for "job performance" on November 28, 2010 which was cancelled following a complaint made by W.M. pursuant to Wal-Mart's "Open Door" policy.[68]

On April 13, 2011, W.M. received a Third Written Coaching for "Attendance/Punctuality".[69] On May 4, 2012, W.M. received a First Written Coaching for "Attendant/punctuality" which expired on May 5, 2013.[70] On November 28, 2012, W.M. received a Second Written coaching for "Job Performance" which expired on November 28, 2013.[71] On May 9, 2015, W.M. received a First Written Coaching for "Attendance/Punctuality."[72] On January 29, 2016, W.M. received a Second Written Coaching for "Job Performance" which expired on January 28, 2017.[73]

---

[62] Defendant's exhibit 1, Goodley depo. pp. 142-144.
[63] Defendant's exhibit 47.
[64] Id.
[65] Id.
[66] Defendant's exhibit 48.
[67] Defendant's exhibit 49.
[68] Defendant's exhibit 50.
[69] Defendant's exhibit 51.
[70] Defendant's exhibit 52.
[71] Defendant's exhibit 53.
[72] Defendant's exhibit 54.
[73] Defendant's exhibit 55.

W.M. performed a different job, in a different department with a different supervisor and did not become a night stocker until nine (9) months after Mr. Goodley's termination.

*B.B.*

Mr. Goodley alleges that B.B. (born in 1983) had excessive absenteeism but was not disciplined or terminated.[74] From August 11, 2013 through November 3, 2013, B.B. was employed as a Food Sales ASC and from November 3, 2013 through May 31, 2015, B.B. was employed as a support manager.[75] Mr. Goodley asserts that someone told him that B.B. falsified attendance records to cover up absences; Mr. Goodley cannot recall who provided him with that information.[76]

*C.S.*

Mr. Goodley complains that C.S. (born in 1960) was treated more favorably; specifically, he had excessive absenteeism but was not disciplined or terminated.[77] C.S. was a department manager from March 18, 2007 until March 10, 2013 and from March 10, 2013 through April 19, 2015, he was employed as "Hardlines ZMS."[78] From April 19, 2015 until his retirement on February 19, 2017, C.S. worked as a department manager. There is no record of C.S. having either an attendance or job performance related issue, nor are there any coachings on record.[79]

*J.B.*

---

[74] Defendant's exhibit 37.
[75] Defendant's exhibit 56.
[76] Defendant's exhibit 1, Goodley depo. pp. 168.
[77] Defendant's exhibit 37.
[78] Defendant's exhibit 57.
[79] Defendant's exhibit 57.

Mr. Goodley complains that J.B. (born in 1965) was treated more favorably because of excessive absenteeism without discipline or being terminated.[80] Between August 16, 2009 through July 12, 2015, J.B. worked as a "Backroom ZMA", Fashion ZMS, Groceries ZMS and Department Manager.[81] J.B. was never employed as a night stocker.[82]

*T.B.*

Mr. Goodley identified T.B. as a comparator "with absenteeism excessive to Plaintiff's who [was] not disciplined or terminated."[83] T.B. worked for Wal-Mart for six (6) months as a night stocker and was terminated on November 29, 2012 for three (3) days of unreported absences.[84] T.B. was rehired in December 2012 as a "Cap Team Associate" but was terminated on March 15, 2013 because she was not available for work.[85] T.B. was not employed during the time period Mr. Goodley received the three (3) written coachings that led to his termination.[86]

*JANUARY 3, 2015 EMAIL*

On January 3, 2015, Co-Manager Leah Loerwald authored and sent an email (the "Leoerwald email") to Mr. Duplechin identifying 17 night associates, which included night stockers, night IMS associates and at least one night CSM with job performance and/or attendance problems.[87] During that time there were approximately 35 night stockers. Of the 17

---

[80] Defendant's exhibit 37.
[81] Defendant's exhibit 58.
[82] Id.
[83] Defendant's exhibit 37.
[84] Defendant's exhibit 59.
[85] Id.
[86] Id.
[87] Defendant's exhibit 29.

associates identified in the Loerwald email, 16 were African-American and one was Caucasian.[88] Of the 16 African-Americans, only three (3) were subsequently discharged, Mr. Goodley being one of them. Mr. Goodley was discharged due to (a) a Third Written Coaching for attendance/job performance; (b) job performance "still below expectations;" and (c) continuing absenteeism problems.[89]

*GOODLEY'S ATTENDANCE REPORT*

The attendance report[90] reveals that from February 25, 2014 until February 3, 2015, Mr. Goodley was absent and/or missed greater than 50% of his work shift for a total of 21 absences.[91]

From February 11, 2014 through February 11, 2015, Mr. Goodley had seven (7) unapproved tardies. Mr. Goodley complains that the entries on the Associate Attendance Report indicating that he missed 50% of his shift on December 16, 2014 and December 23, 2014 are inaccurate and/or fabricated, but does not dispute the remaining entries.[92] Mr. Goodley submits his Attendance Records and Time Clock Archive as to the alleged two (2) incomplete shifts. The evidence records these two (2) days as "Business Need; Incomplete Shift". Yet, the Time Clock Archive shows that Mr. Goodley clocked in at approximately 2200 hours and clocked out at approximately 0700 hours when his shift ended. Wal-Mart suggests that while Mr. Goodley believes that his attendance records may have been fabricated as to these two days, that belief

---

[88] Defendant's exhibits 29 and 35.
[89] Defendant's exhibit 29.
[90] The Associate Attendance Report is a computer generated report produced at the time of Mr. Goodley's termination. Defendant's exhibit 33, Engelbrecht Declaration, ¶ 4.
[91] Defendant's exhibit 33.1. (3 unapproved tardies equals 1 absence; three of the absences were the result of 3 unapproved tardies, i.e. 9 tardies).
[92] Defendant's exhibit 1 Goodley depo. pp. 71-73.

does not suggest that race was a motivating factor, and even if he was erroneously charged for missing part of his shifts on those two days, Plaintiff's termination was also due to poor job performance due to low productivity. Furthermore, neither Ms. Loerwald, nor Mr. Duplechin made any entry, modification or revision to Mr. Goodley's Associate Attendance Report, nor were either aware at the time of Mr. Goodley's termination that there were any inaccuracies contained in the report.[93]

*AGE DISCRIMINATION CLAIM*

In his deposition, Mr. Goodley testified that his discharge was based 50% on his age and 50% on his race; he further testified that his age was not the sole or even the predominant cause of his termination.[94] Mr. Goodley testified that he is not aware of any other long-term African-American stocker who was terminated.[95] From 2012 through 2015, approximately 75% of associates terminated due to attendance problems were under age 40.[96] The sole basis for Mr. Goodley's age discrimination claim is that most of the night stockers hired after his termination were under the age of forty.

*RACE STATISTICS FOR STORE NO. 469*

---

[93] Defendant's exhibit 35, Loerwald Declaration ¶ 15; Defendant's exhibit 2, Duplechin Declaration ¶ 14.
[94] Defendant's exhibit 1, Goodley depo. p. 57.
[95] Id. p. 174.
[96] Defendant's exhibit 33.

All Wal-Mart employees are referred to as Associates. In 2015, sixty-eight percent of the Associates at Store No. 469 were African-American[97] and of the thirty managers at the store, 18 (or 60%) were African-American.[98]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-moving party, indicate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[99] A fact is "material" if its existence or nonexistence "might affect the outcome of the suit under governing law."[100] A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.[101] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[102] Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.[103] The burden requires more than mere allegations or denials of the adverse party's pleadings. The non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law.[104] There is no genuine

---

[97] Defendant's exhibit 13.
[98] Id.
[99] Fed. R. Civ. P. 56(c).
[100] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).
[101] Stewart v. Murphy, 174 F.3d 530, 533 (5th Cir. 1999).
[102] Vera v. Tue, 73 F.3d 604, 607 (5th Cir. 1996).
[103] Anderson, 477 U.S. at 249.
[104] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

issue of material fact if, viewing the evidence in the light more favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[105] If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.[106] The court will construe all evidence in the light most favorable to the nonmoving party, but will not infer the existence of evidence not presented.[107]

## LAW AND ANALYSIS

Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[108] Title VII discrimination can be established through either direct or circumstantial evidence."[109] "Direct evidence is evidence that, if believed, proves the fact or discriminatory animus without inference or presumption."[110]

"Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of McDonnell Douglas corp. v. Green.[111]

---

[105] Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).
[106] Anderson, 477 U.S. at 249-50.
[107] Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).
[108] 42 U.S.C. sec 2000e-2(a)(1).
[109] Laxton v. Gap, Inc. 333 F.3d 572, 578 (5th Cir. 2003), cert. denied 535 U.S. 1078, 122 S.Ct. 1961 (2002)).
[110] West v. Nabors Drilling USA, Inc., 330 F.3d 379, 384 n.3 (5th Cir. 2003) (quoting Sandstad v. CB Richard Ellis, Inc., 309 F.3d 893, 897 (5th Cir. 2002) cert. denied, 539 U.S. 926, 123 S.Ct. 2572 (2003)).
[111] 411 U.S. 792, 93 S.Ct. 1817 (1973).

To establish a *prima facie* case of unlawful race discrimination, a plaintiff must carry the initial burden by showing that (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment decision, and (4) he was treated less favorably than a similarly situated person of a different race.[112] Once a *prima facie* case is made, the burden shifts to defendant to produce sufficient evidence to support a legitimate non-discriminatory reason for its decision, and if that burden of production is met, the plaintiff must then offer sufficient evidence to create a genuine issue of material fact that either (1) the employer's reasons is a pretext, or (2) that the employer's reasons, while true, is only one of the reasons for its conduct, and another "motivating factor" is the plaintiff's protected characteristic (mixed-motive[s] alternative).[113][114] An employment discrimination plaintiff under Title VII may demonstrate pretext by providing evidence that a similarly situated employee outside his or her protected class received more favorable treatment under identical circumstances.[115]

Based on the undisputed summary judgment evidence outlined above, the court finds that Mr. Goodley has failed to establish a *prima facie* case of race discrimination. Furthermore, even if he could establish a *prima facie* case of discrimination, Wal-Mart has presented a legitimate non-discriminatory basis or reason for Mr. Goodley's termination. And finally, it seems that Mr. Goodley is relying on the state court lawsuit against Wal-Mart in which Ms. Leorwald was involved as a basis for pretext. Considering the undisputed summary judgment evidence,

---

[112] McDonnell Douglas Corp., 411 U.S. at 802.
[113] Rachid v. Jack In the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004)(citing McDonnell Douglas Corp. v. Green.
[114][114] The same evidentiary procedure for allocating burdens of production and proof applies to discrimination claims under both statutes. Meinecke v. H & R Block, 66 F.3d 77, 83 (5th Cir. 1995)(percuriam).
[115] Turner v. Kan. City S. Ry. Co., 675 F.3d 887, 895 (5th Cir. 2012).

we find that this evidence does not prove that race was a motivating factor, or that Wal-Mart's reason for termination was pretextual.

Specifically, after considering the associates Mr. Goodley identifies as being similarly situated but treated differently, we find that they are not appropriate comparators based on the specific undisputed facts presented by Wal-Mart as to each comparator. Furthermore, even though there is a discrepancy as to Mr. Goodley's attendance record, even considering these discrepancies, Wal-Mart was within its rights based on its policies for terminating Mr. Goodley for excessive absences, tardies and low productivity. There is no evidence in the record to establish otherwise; there is no evidence in the record that white associates in similar circumstances were treated more favorably. Finally, Wal-Mart presented undisputed summary judgment evidence to establish a legitimate non-discriminatory reason for terminating Mr. Goodley, and there is no evidence in the record to establish that Wal-Mart's reason for terminating Mr. Goodley was pretextual.

*Age Discrimination*

The court further finds that Mr. Goodley has failed to establish a claim for age discrimination. Mr. Goodley must show that "but for his age" he would not have been terminated. Again, his sole basis for this claim is that the night stockers hired after his termination (with one exception) were under the age of forty.

To establish a cause of action for age discrimination, a plaintiff must show that: (1) he is a member of the protected class of 40 years or older; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was either replaced by a younger employee

or treated less favorably than other similarly situated employees outside the protected class.[116] Like a Title VII case, once the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment decision at issue.[117] If the employer is able to articulate such a reason, the burden shifts back to the employee who bears the ultimate burden of proving, by a preponderance of the evidence, that the employer's reasons 'were not its true reasons but were a pretext for discrimination.'"[118] A plaintiff asserting an age discrimination claim under the ADEA bears the ultimate burden of persuasion and must convince the trier of fact that the defendant engaged in intentional discrimination based on age. A plaintiff must demonstrate that age was the "but for" cause of the employment decision at issue.[119] In other words, age was the reason the employer decided to act.

Mr. Goodley uses the same seven (7) associates who allegedly received more favorable treatment for absenteeism due to their race as also receiving more favorable treatment based on their age. At the time of Mr. Goodley's discharge, A.M. was 49 years old, R.W.B was 57 years old, J.B. was 49 years old and C.S. was 55 years old. Ms. Leorwald, the alleged offender, was one year younger than Mr. Goodley. Furthermore, the record reflects that Mr. Goodley was treated more favorably than the comparator associates. Wal-Mart also submits undisputed summary judgment evidence that shows that 75% of the associates terminated between 2012

---

[116] Berquist v. Washington Mut. Bank, 500 F.3d 344 (5th Cir. 2007).
[117] Id.
[118] Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).
[119] Gross v. FBL Financial Services, Inc., 557 U.S. 167 (2009); Moss v. BMC Software, Inc., 610 F.3d 917 (5th Cir. 2010).

and 2015 due to attendance problems were under the age of 40. There is not one scintilla of evidence in this case that age was the reason for Mr. Goodley's termination.

The court finds that Mr. Goodley has failed to establish a *prima facie* case of age discrimination. The court further finds that Wal-Mart has presented undisputed summary judgment evidence to show a legitimate non-discriminatory reason for Mr. Goodley's termination. Finally, Mr. Goodley has failed to show that Wal-Mart's non-discriminatory reasons were pretextual.

*Extension for discovery*

In his opposition, and in the event this court does not agree with Plaintiff's assessment of the evidence, Mr. Goodley requests that the court grant him a continuance or an opportunity to supplement the summary judgment record prior to our ruling. First, Mr. Goodley complains that Wal-Mart relies on the declaration of Tracy Englebrecht in its motion, a person not yet identified to Plaintiff. Thus, Mr. Goodley asserts that he would need to depose Ms. Englebrecht. Wal-Mart informs the court that Ms. Englebrecht's declaration is being submitted for the sole purpose of authenticating Wal-Mart records for which she is the custodian. Wal-Mart remarks that Mr. Goodley has failed to identify a genuine issue of material fact that could be created by conducting the discovery indicated in Plaintiff's motion as required by Federal Rule of Civil Procedure 56(f). The court agrees and finds that Mr. Goodley's request for a continuance to depose Ms. Englebrecht is without merit.

Next, Mr. Goodley seeks a continuance to depose four (4) witnesses, only two (2) of which he identified—Jared Daigle and Alex Morris. Wal-Mart asserts that again, Plaintiff has failed to

identify what material issue of disputed fact could be created by the deposition of these witnesses. Jared Daigle was the associate that completed Mr. Goodley's exit interview which was initially begun by Ms. Loerwald. However, as noted by Wal-Mart, Mr. Daigle had no involvement with the decision to terminate Mr. Goodley. Similarly, Alex Morris was the manager Mr. Goodley believed assigned him a workload that was allegedly racially motivated in 2012. Mr. Morris has not been employed by Wal-Mart since November 2012 and had no involvement in Mr. Goodley's termination or the coachings that led to his termination. The court agrees with Wal-Mart and finds that there is no reasonable justification for granting a continuance for this additional discovery.

*Punitive Damages*

The court finds that because a willful violation[120] under the ADEA has not been proven, and there is not sufficient evidence to establish that Wal-Mart knew or showed reckless disregard, Plaintiff's claims for punitive damages under the ADEA and Title VII should be dismissed with prejudice.

---

[120] A violation is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." <u>Trans World Airlines, Inc. v. Thurston, et al.</u>, 496 U.S. 111, 128 (1985).

## CONCLUSION

For the reasons discussed above, Wal-Mart's motion for summary judgment will be granted in its entirety dismissing with prejudice all of Plaintiff's claims at Plaintiff's costs.

**THUS DONE AND SIGNED** in Alexandria, Louisiana on this _15_th day of August, 2017.

 

 

 

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE